UNITED STATES DISTRICT COURT
SOUTHERN DISRICT OF NEW YORK

---------------------------------------X

M.M. and H.M., on behalf of, A.M.,

        Petitioners,

   -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION Region 9 (District 2),

       Respondent.

---------------------------------------X

07 Civ. 2265

OPINION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10 21 08

A P P E A R A N C E S:

      Attorney for Petitioners

      MAYERSON & ASSOCIATES
      330 West 38th Street, Suite 600
      New York, NY  10018
      By:  Christina D. Thivierge, Esq.


      Attorney for Respondent

      MICHAEL A. CARDOZO
      Corporation Counsel of the
        City of New York
      100 Church Street, Room 2-306
      New York, NY  10007
      By:  Steven D. Weber, Esq.

**Sweet, D.J.,**

Plaintiffs, M.M. and H.M., on behalf of A.M., have moved for modified de novo review of the August 3, 2006, administrative Decision of Impartial Hearing Officer ("IHO") Susan M. Kafer and the November 20, 2006, Decision of State Review Officer ("SRO") Paul F. Kelly regarding the adequacy of the Individualized Education Plan ("IEP") for the 2005-2006 school year offered to A.M. by the New York City Department of Education ("DOE" or the "Defendant") pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA" or the "Act"). The DOE has cross-moved for summary judgment pursuant to Rule 56, Fed. R. Civ. P. For the reasons set forth below, the motion of the Plaintiffs is denied, and the cross-motion of the DOE is granted.

## Prior Proceedings

A.M. (the "Student") is a young girl with autism who was born on September 6, 2002. The Student's classification as a child with a disability is not in dispute. A.M. began receiving Early Intervention ("EI") services from New York State on or around September 2004. Pursuant to her Individualized Family Service Plan ("IFSP"), while in EI, A.M. received 30

1

hours per week of 1:1 Applied Behavior Analysis ("ABA") therapy, ABA supervision, parent training, 2 hours per week of 1:1 occupational therapy, 5 hours per week of 1:1 speech and language therapy, and 2 hours per week of physical therapy, and one hour per month was set aside for a "team meeting" with all of the Student's therapists.

On April 5, 2005, A.M.'s mother consented to notifying the DOE's Committee on Pre-School Education ("CPSE") that the Student might be eligible to receive special education services from the DOE. On May 13, 2005, the Student's mother consented to an initial evaluation to determine the Student's eligibility. She designated the Herbert G. Birch Early Childhood Center ("Herbert Birch") to conduct an evaluation of the Student prior to the development of the Student's IEP.

Evaluations of the Student were performed and sent to the CPSE for its consideration. A CPSE review was held on July 12, 2005, and August 1, 2005.

At the July 12 meeting, the Student's mother provided the CPSE with copies of the Student's most current evaluations and progress reports containing a series of intervention recommendations for the Student. At the beginning of the

2

meeting, Helen Berman ("Berman"), the DOE representative, handed the Student's mother a written IEP. Tr. at 85.[1] At the meeting, the Student's mother requested a 12-month program with 20-30 hours of ABA programming per week, speech and language therapy every day, and 10 hours per week of ABA therapy at home. Tr. at 85. Two educators who had worked with the Student recommended that the Student receive "a 12 month program of 20 to 30 hours of ABA" per week, plus occupational therapy three or four times a week, physical therapy once a week, and ten hours of ABA at home, one to one. Tr. at 87. The DOE recommended four possible placements for the Student, including P.S. 176. Def.'s 56.1 ¶ 10; Tr. at 85.

At the second meeting, on August 1, 2005, the District recommended placement at P.S. 176, where the Student would be placed in an class with 8 students, 1 teacher, and 2 paraprofessionals (an "8:1:2" class) for five hours a day, five days a week, 12 months a year, with the addition of a 1:1 management paraprofessional. The recommended placement included speech and language therapy, occupational therapy, and physical therapy three times a week for 30 minutes each, provided on an individual basis. Def.'s 56.1 at ¶ 14; Def.'s Ex. 24.

---

[1] Transcript references refer to the IHO Hearing on April 7, 2006, and April 20, 2006.

By letter dated August 10, 2005, the Student's mother rejected the P.S. 176 placement recommended by the CPSE and informed the DOE that she would be enrolling the Student at the McCarton School, a private placement. Pls.' Ex. B. As a result of the Student's enrollment at the McCarton School, the Student's EI services were discontinued. The McCarton School has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities. SRO Dec. at 1.

By due process complaint dated September 8, 2005, Plaintiffs requested an impartial hearing and alleged procedural and substantive violations of the IDEA, including, inter alia, that the CPSE was improperly constituted and that the goals and objectives contained in the IEP were inappropriate and not objectively measurable, resulting in the denial of a free appropriate public education ("FAPE") to the Student. Pls.' Ex. A.

An impartial hearing was convened on April 7 and April 20, 2006. By decision dated August 3, 2006, the IHO concluded that the services offered by Defendant were appropriate and that any alleged procedural defects related to the CPSE review and/or the generation of the Student's IEP were without merit.

4

The IHO found that the CPSE was duly constituted, noting that the psychologist who had evaluated the Student was present at the CPSE meeting, and the presence of a regular education teacher was not required. IHO Dec. at 8. The IHO further found that the Student's IEP incorporated evaluations of the Student conducted by professionals of the Plaintiffs' choosing and the goals recommended by those evaluations, as well as requests from the Plaintiffs, including the addition of a one to one paraprofessional. Id. at 9.

With regard to the substantive adequacy of the IEP, the IHO stated that "[w]hether or not the objectives and goals set forth in the CPSE IEP are attainable is something that can be judged only with the benefit of hindsight," and concluded that "[a]lthough one might argue that the smaller class size [of the Student's private placement] is preferable, I cannot conclude from the evidence presented that the 8:1:2 class would be detrimental to the child." IHO Dec. at 9. The IHO found that the Defendant offered the Student a FAPE and, therefore, there was no need to address the questions of the appropriateness of the Plaintiffs' private placement or any of the equitable considerations raised by Plaintiffs. The IHO also considered the Plaintiffs' request for the continued provision of EI services pursuant to the Student's IFSP during the

pendency of the due process hearings, found that such pendency
placement was not appropriate, and denied the Plaintiffs'
request for tuition reimbursement.

The Plaintiffs appealed to the SRO and sought reversal
of the IHO's August 3, 2006, decision. By decision dated
November 20, 2006, the SRO dismissed the Plaintiffs' appeal.
The SRO found that the program offered by the DOE to the Student
for the 2005-2006 school year was appropriate, that any alleged
procedural errors were not supported by the record or did not
rise to the level of a denial of a FAPE, and that the Student's
IEP was reasonably calculated to provide meaningful educational
benefit. Because the SRO determined the Student was not denied
a FAPE, he did not address the appropriateness of the
Plaintiffs' private placement or the equitable considerations.
The SRO also found that the Student was not entitled to EI
services as a pendency placement. Id. at 18.

The Plaintiffs filed this action on March 16, 2007,
pursuant to the IDEA, 20 U.S.C. § 1415(i)(2)(A), in order to
seek a modified de novo review and reversal of the August 3,
2006, IHO Decision and the November 20, 2006, SRO decision, and
the determination that the program and services that the Student

received in her private placement were appropriate and reimbursable.

On October 5, 2007, the Plaintiffs moved for a modified de novo appeal and for reimbursement and the DOE cross-moved for summary judgment. The motions were heard and marked fully submitted on October 31, 2007.

The Court notes that, in support of their motion, Plaintiffs have submitted an article identified as published in the Wall Street Journal entitled "Schools Beat Back Demands for Special-Ed Services." Aff. of Christina D. Thivierge, Ex. A. The article disparages the SRO and implies bias. As this submission constitutes inadmissible hearsay, the Court has not taken it into consideration in reaching its decision.

**Statutory Framework**

The IDEA provides that states which receive funding under the statute must provide each student with a disability with a "free appropriate public education," 20 U.S.C. § 1400(d)(1)(A), comprised of special education and related services, provided at public expense, which meet the standards of the State educational agency. 20 U.S.C. § 1401(9). A FAPE

must be "tailored to meet the unique needs of a particular child" and must be "'reasonably calculated to enable the child to receive educational benefits.'" Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)).

Special education and related services must be administered according to an IEP, "which school districts must implement each year for each student with a disability." D.F. v. Ramapo Cent. Sch. Dist., 430 F.3d 595, 598 (2d Cir. 2005) (quoting Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003)). In New York State, local Committees on Special Education ("CSE") appointed by school boards or the trustees of school districts are charged with developing IEPs. Walczak,, 142 F.3d at 123. "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107-108 (2d Cir. 2007) (citing N.Y. Comp. Codes R. & Regs. ("N.Y.C.C.R.R") tit. 8, § 200.1(ww)(3)(i)). The IEP must set forth the goals and objectives for the student, and the recommended educational program and related services to attain those goals and objectives. 20 U.S.C. § 1414(d). Both federal

8

and state special education laws require that a child with a disability be educated in the least restrictive environment ("LRE"), that is, with nondisabled peers to the extent feasible and appropriate. 20 U.S.C. § 1412(a)(5); N.Y. Educ. Law § 4402.

Parents who believe that an IEP is inappropriate for their child may "request an administrative review, enroll their child unilaterally in a private school and request retroactive reimbursement." Collins v. Bd. of Educ., 164 Fed. Appx. 19, 20 (2d Cir. 2006). "However, if parents 'unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local officials, [they] do so at their own financial risk.'" Id. (quoting Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 373-74 (1985)).

The administrative decision of an Impartial Hearing Officer may be appealed to the State Review Officer, whose decision is final in the administrative review process. 20 U.S.C. § 1415(f)(1)(A), (g)(1); N.Y. Educ. Law §§ 4404(1), (3). After the completion of this administrative review process, the aggrieved party may appeal the decision of the SRO in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

9

**Standard of Review**

Federal courts reviewing administrative determinations under the IDEA must base their decisions on the preponderance of the evidence developed at the administrative proceedings and any additional evidence presented by the parties. M.S. v. Yonkers Bd. of Educ., 231 F.3d 96, 102 (2d Cir. 2000) (citing Walczak, 142 F.3d at 122-23); 20 U.S.C. § 1415(i)(2)(C). The burden of proof in an administrative proceeding challenging an IEP is placed on the party seeking relief. Schaffer v. Weast, 546 U.S. 49, 57-58 (2005).

In determining if parents who challenge an educational program are entitled to reimbursement, a court must first determine if the program offered by the school district is inadequate to afford the child a FAPE. Cabouli v. Chappaqua Cent. Sch. Dist., 202 Fed. Appx. 519, 521 (2d Cir. 2006) (citing Walczak, 142 F.3d at 129). Only if the program offered by the school district is inadequate must a federal court then determine if the private schooling obtained by the parents is appropriate to the student's needs. Id.

In determining whether the program offered by the school district in the challenged IEP constitutes a FAPE, a

court considers: "(1) whether the state complied with the
procedural requirements of IDEA, and (2) whether the challenged
IEP was 'reasonably calculated to enable the child to receive
educational benefits.'" Walczak, 142 F.3d at 129 (quoting Bd.
of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982)).

While the decisions of the IHO and SRO are subject to
"independent" judicial review, the United States Supreme Court
and the Second Circuit "have interpreted the IDEA as strictly
limiting judicial review of state administrative proceedings."
D.F., 430 F.3d at 598 (citations omitted). A district court
review "'is by no means an invitation to the courts to
substitute their own notions of sound educational policy for
those of the school authorities they review.'" Walczak, 42 F.3d
at 129 (quoting Rowley, 458 U.S. at 206). Therefore, "[w]hile
federal courts do not simply rubber stamp administrative
decisions, they are expected to give 'due weight' to these
proceedings, mindful that the judiciary generally 'lacks the
specialized knowledge and experience necessary to resolve
persistent and difficult questions of educational policy.'" Id.
(quoting Rowley, 458 U.S. at 206, 208) (internal quotation marks
and citations omitted). "Deference is particularly appropriate
when . . . the state hearing officers' review has been thorough
and careful." Id.

**The Defendant Offered the Student a Free Appropriate Public Education**

The IHO and SRO concluded that the IEP offered to the Student by DOE complied with the procedural requirements of IDEA and was substantively proper. The Plaintiffs have failed to establish that those conclusions were reached in error.

## i. Procedural Requirements

At the administrative level, the SRO thoroughly evaluated Plaintiffs' claims of procedural violations of the IDEA and found that any such alleged violations "were not supported by the record, or did not rise to the level of a denial of FAPE." SRO Dec. at 17. Not all procedural errors render an IEP inadequate under the IDEA. Watson v. Kingston City Sch. Dist., 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004) (citing Grim, 346 F.3d at 381), aff'd, 142 Fed. Appx. 9, 11 (2d Cir. 2005). Relief is warranted only when a procedural violation affects a student's right to a FAPE. See J.D. ex rel. J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 (2d Cir. 2000) (citations omitted).

The IDEA provides that a student does not "receive a free appropriate public education only if the procedural inadequacies: (I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. 1415(f)(3)(E)(ii); see also Werner v. Clarkstown Cent. Sch. Dist., 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005) ("[P]rocedural flaws do not automatically require a finding of a denial of a FAPE. But procedural inadequacies that individually or cumulatively result in the loss or educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP constitute a denial of FAPE.") (citation omitted). As found by the IHO and SRO, the Plaintiffs have failed to establish that any alleged procedural violations here resulted in the denial of a FAPE.

*(a) Composition of the CPSE*

The Plaintiffs assert that the CPSE was improperly constituted, as it did not include all members required by the New York Regulations of the Commissioner of Education, which provide that each CPSE shall include: 1) the parents of the

13

preschool child; 2) a regular education teacher "whenever the child is or may be participating in the regular education environment"; 3) a special education teacher; 4) a representative of the school district; 5) an additional parent of a child with a disability residing in the school district; 6) an individual who can interpret the instructional implications of evaluation results; 7) other persons having knowledge or special expertise regarding the child, including related services personnel as appropriate, as the school district or the parents shall designate; 8) for a child in transition from early intervention programs and services, at the request of the parent, the appropriate professional designated by the agency that has been charged with the responsibility for the preschool child; and 9) a representative of the municipality of the preschool child's residence. N.Y.C.R.R. tit. 8, § 200.3(a)(2).

The Plaintiffs allege that at the August 1, 2005, IEP meeting, there was no general education teacher, no education evaluator, no school psychologist, no school social worker, no special education teacher, no related services provider, and no representative of P.S. 176, rendering the CPSE improperly constituted. However, as the SRO and IHO concluded, Plaintiffs have failed to establish that the CPSE was improperly composed

14

or that the meeting's composition affected the Student's ability to receive a FAPE. SRO Dec. at 11-12; IHO Dec. at 8.

As reflected on the IEP, Pls.' Ex. E at 2, the CPSE meeting participants included the Student's mother, the district representative, a special education teacher, an additional parent member, and the Student's EI services coordinator from the Children's Home Intervention Program ("CHIP"). The testimony establishes that a psychologist who had evaluated the Student was also present at the first CPSE meeting, Tr. at 99-100, and Plaintiffs have failed to set forth any detrimental effect on the Student caused by the psychologist's absence from the second CPSE meeting.

While the IDEA requires the presence of a general education teacher at the CSE meeting where "a child is, or may be, participating in the regular education environment," 20 U.S.C. § 1414(d)(1)(B)(ii), a regular education teacher was not required at the Student's IEP meeting because the Student was not participating in or being considered for participation in a regular education environment. See, e.g., Tarlowe v. Bd. of Educ., No. 07 Civ. 7936 (GEL), 2008 U.S. Dist. LEXIS 52704, at *15 (S.D.N.Y. July 3, 2008). Moreover, Plaintiffs have not established either that they requested regular education

participation or that, based on the Student's history, she
should have been considered for such an environment.

Finally, as the SRO noted, there is no requirement
that a school social worker or representative from the
district's placement be present at the CPSE meeting, therefore,
their absence does not constitute a procedural violation.  SRO
Dec. at 12.

### (b)  Predetermination

Plaintiffs' further assert that they were denied
meaningful involvement in development of Student's IEP because
it was impermissibly predetermined by the DOE.  In support of
this assertion, Plaintiffs point to the fact that the district
representative, Berman, presented the Student's mother with a
written IEP at the first CPSE meeting, and, according to the
Student's mother, Berman refused to consider her suggested
changes.  Tr. at 85; Compl. ¶¶ 15, 18.

So long as they do not deprive parents of the
opportunity to meaningfully participate in the IEP development
process, see Deal v. Hamilton County Bd. of Educ., 392 F.3d 840,
858 (6th Cir. 2004) ("Participation must be more than a mere

form; it must be *meaningful*.") (internal quotation marks and
citation omitted, emphasis in original), draft IEPs are not
impermissible under the IDEA. See, e.g., Nack ex rel. Nack v.
Orange City Sch. Dist., 454 F.3d 604, 611 (6th Cir. 2006)
("'[S]chool evaluators may prepare reports and come with pre-
formed opinions regarding the best course of action for the
child as long as they are willing to listen to the parents and
parents have the opportunity to make objections and
suggestions.'") (quoting N.L. v. Knox Cty. Schs., 315 F.3d 688,
694 (6th Cir. 2003)); W.S. v. Rye City Sch. Dist., 454 F. Supp.
2d 134, 147-48 (S.D.N.Y. 2006) (stating that equating draft IEPs
containing proposed placements with predetermination "will
inevitably lead to gamesmanship in the preparation of IEPs by
CSEs, with the district withholding points of view that ought to
be out on the table and subject to discussion and parental
challenge . . . prior to the document's finalization."); cf.
Brennan v. Reg'l Sch. Dist. No. 1 Bd. of Educ., 531 F. Supp. 2d
245, 274 (D. Conn. 2007) (finding that a draft IEP did not
violate the IDEA, although it was not altered following the
CSE's receipt of additional evaluation reports, where "the
district came to the [planning] meeting with a draft IEP, it
looked at the new evaluation data, and it concluded that its
draft IEP was appropriate."). But see T.P. v. Mamaroneck Union
Free Sch. Dist., No. 06 Civ. 0509 (CLB), 2007 U.S. Dist. LEXIS

35288, at *18-19 (S.D.N.Y. May 11, 2007) (finding that school district had not come to CSE with an "open mind" and had impermissibly predetermined student's IEP where, inter alia, recommendations prepared before IEP meeting were the same as those ultimately provided, despite the Parents' disapproval).

Here, the Student's IEP and placement were not finalized until after both of the Student's IEP meetings, the Student's mother participated at the IEP meetings, she visited the Defendant's proposed placements, and she contributed to the Student's final IEP. Tr. at 85, 106-107; SRO Dec. at 16. After the initial IEP meeting on July 12, 2005, the DOE responded to the Student's mother's request by amending the Student's IEP to include a one to one paraprofessional for the Student. Tr. at 106; Pls.' Ex. E at 1; SRO Dec. at 16. Additionally, as the SRO described in detail, the IEP incorporated evaluations of the Student conducted by professionals of the Plaintiffs' choosing and the goals those professionals recommended. SRO Dec. at 13-14; IHO Dec. at 9.

### (c) Written Notice of Reasons

Finally, the Plaintiffs assert that the DOE's failure to provide them with written notice of its reasons for rejecting

their requests for additional services constituted a procedural
violation of the IDEA. While the DOE does not contest its
failure to provide such written notice, the Court agrees with
the conclusion of the SRO that the Plaintiffs have failed to
establish that this failure "significantly impeded" their
ability to participate in the decision-making process or caused
a deprivation of educational benefits to the Student. SRO Dec.
at 12.

## ii. Substantive Requirements

The Plaintiffs have alleged that "the program and
services recommended for A.M. for 2005-2006 were insufficient to
meet her individual needs" and, therefore, do not constitute a
FAPE. Compl. ¶ 17. The Plaintiffs assert that the IEP fails to
accurately report the Student's present levels of performance
and does not contain appropriate and measurable goals and
objectives. The Plaintiffs also assert that the District
erroneously failed to consider offering the Student assistive
technology, failed to provide a Functional Behavior Analysis
("FBA") or Behavior Intervention Plan ("BIP"), and improperly
refused to include parent training in the IEP.

As noted above, a student shall be determined to have
received a FAPE if the student's IEP was reasonably calculated
to confer educational benefit on the student. Walczak, 142 F.3d
at 129. "While the IDEA does not require states to maximize the
potential of handicapped children, it must provide such children
with meaningful access to education." Frank G. and Dianne G. v.
Bd. of Educ., 459 F.3d 356, 364 (2d Cir. 2006) (internal
quotation marks and citations omitted). Therefore, in
evaluating an IEP, a federal court must examine the record for
any "objective evidence" that the student's IEP will afford more
than "trivial advancement" and is "likely to produce progress,
not regression." Cerra v. Pawling Cent. Sch. Dist., 427 F.3d
186, 195 (2d Cir. 2005) (quoting Walczak, 142 F.3d at 130).

However, "[b]ecause administrative agencies have
special expertise in making judgments concerning student
progress, deference is particularly important when assessing an
IEP's substantive adequacy." Cerra, 427 F.3d 186 at 195
(citation omitted). The Second Circuit has stated that it has
"not hesitated to vacate district court opinions where the
district court 'erred in substituting its judgment for that of
the agency experts and the hearing officer.'" Id. (quoting
Briggs v. Bd. of Educ., 882 F.2d 688, 693 (2d Cir. 1989)).
Here, based upon the same record presently before the Court, the

SRO and IHO determined that the Student's IEP was substantively proper, and the Plaintiffs have not met their burden of demonstrating that that conclusion is erroneous.

### (a) Performance Levels and Goals and Objectives

The IDEA requires that the IEP contain, inter alia, a statement of the child's present levels of academic achievement and functional performance, a statement of measurable annual goals, including academic and functional goals, and a description of how the child's progress toward those goals will be measured. 20 U.S.C. § 1414(d)(1)(A)(i). Plaintiffs contend that the IEP inaccurately reflected the Student's then-present levels of performance and that the DOE failed to develop appropriate and measurable goals and objectives, as the Student lacked the prerequisite skills to attain most of the proposed goals and the goals were too vague to be measurable.

In support of their claim, the Plaintiffs point to the testimony of Jacqueline Hickey, Associate Education Director of the McCarton School, who worked directly with the Student. Hickey testified that at the time the IEP was developed, the Student did not have the prerequisite skills needed to attain a number of the goals contained therein, including the ability to

imitate simple gross motor movements required for learning to imitate full body movements, the matching skills required to learn object and picture sorting, and the motor planning abilities required for learning to dress independently. Tr. at 227-32. However, the SRO specifically referenced this testimony in his decision and concluded that it was unsupported by the record, in light of the evaluations of the Student provided by the Plaintiffs to the CPSE. SRO Dec. at 14-15. Those evaluations included "the initial evaluation completed by Herbert Birch that included a social history, psychological, speech-language, occupational therapy, and physical therapy evaluations," an April 2005 speech-language progress report completed by the Student's private therapist, evaluation reports from the McCarton Center dated April and May 2005, a June 2005 progress report completed by the Student's EI physical therapist, and a July 2005 progress from the Student's EI special educator. SRO Dec. at 13; Pls.' Exs. H, J-L, N-P, R-U; Def.'s Ex. 7.

As the SRO found, the evaluations contain numerous conclusions which contradict the testimony relied on by the Plaintiffs. For example, a January 2005 report from the Student's EI provider reported that the Student was able to imitate several gross motor tasks, and had "matched more than 10

different objects and inserted 12 shapes in a shape sorter."
SRO Dec. at 14; Pls.' Ex. Z at 2, 7. In an April 2005
evaluation report, Mary Lowery, the Educational ABA Supervisor
at the McCarton School, stated that, while the Student's
"imitation abilities were variable, depending on her attention
and motivation," she "did imitate many gross motor skills and
some fin[e] motor skills." Pls.' Ex. T at 1. Lowery also
stated in that report that, while the Student's "ability to
perform on visual tasks was variable," she was able "to match
identical objects to a sample and picture-to-picture in a field
of six," "to match picture-to-object and object-to-picture
independently in a field of three," and "to sort two simple and
familiar non-identical items into categories." Id.

        The SRO concluded that the Student's IEP reflected the
evaluations submitted to the CPSE and accurately reported her
present levels of performance. SRO Dec. at 13. Based upon the
evaluations, as well as the testimony of the Assistant Principal
of P.S. 176, Elena Talamo, regarding the proposed placement, the
SRO further concluded that the IEP properly included measurable
annual goals, which provided "a framework for further refinement
by the classroom personnel responsible for overseeing the
child's program," including short term objectives written with
"requisite specificity to enable the child's teachers and

petitioners to understand the CPSE's expectations with respect to each annual goal and what the child would be working on over the course of the school year." Id. at 15.

Giving due weight to the administrative determination of the SRO, the Court finds that the SRO's conclusions are supported by the record and that Plaintiffs have not met their burden of establishing by a preponderance of the evidence that they are erroneous. See Tarlowe, 2008 U.S. Dist. LEXIS 52704, at * 28 ("The sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers.") (quoting Grim, 346 F.3d at 382).

(b) *Assistive Technology*

The SRO found that the Plaintiffs' assertion that the Defendant failed to consider offering the Student any assistive technology was without merit. In so concluding, the SRO cited the testimony of the Assistant Principal of P.S. 176 that the proposed placement for the Student was a language-based classroom with ABA programming and that each of the students at P.S. 176 utilizes "picture exchange communication system" ("PECS") books for communication. SRO Dec. at 17; Tr. at 33.

The Plaintiffs specifically cite PECS as an assistive technology that that the Student utilized in EI and that the CPSE should have considered. See Pls.' Mem. in Supp. at 20. The Court affirms the conclusion of the SRO, as it is supported by the record and the Plaintiffs have not cited to any evidence establishing that it was reached in error.

(c) *Parent Training*

Pursuant to N.Y.C.R.R. tit. 8, § 200.13(d),

"[p]rovision shall be made for parent counseling and training . . . for the purpose of enabling parents to perform appropriate follow-up intervention activities at home." Although the Student's IEP did not contain a parent training provision, the SRO concluded that record did not reflect that the district was unwilling to provide such services, because, as the Student's mother testified, it was agreed at the CPSE meeting that home services could be requested at a later date. SRO Dec. at 16; Tr. at 106-107. Moreover, the SRO found that "petitioners have received extensive parent training in the past and have been actively involved in their child's education, communicating regularly with her teachers and service providers." Id. As the SRO's conclusion is supported by the record and the Plaintiffs have not offered any additional evidence to the contrary, the

Court affirms the SRO's determination. Cf. T.P. v. Mamaroneck
Union Free Sch. Dist., 2007 U.S. Dist. LEXIS 35288, at *23-24
(declining to "reverse the SRO's conclusion that the District's
refusal to provide parental training at home was justified for
the reason that the parents were already very knowledgeable
about their son's circumstances," and therefore did not
constitute a procedural violation of the IDEA, as the court
could not determine that the refusal to provide training caused
the child "substantial harm," but noting that the court found
that rationale "dubious in a case involving the changing and
evolving needs of an autistic child.").

### (d) *Functional Behavior Analysis*

Under the IDEA, "in the case of a child whose behavior
impedes the child's learning or that of others," the IEP team
shall "consider the use of positive behavioral interventions and
supports." 20 U.S.C. § 1414(d)(3)(B)(i). Here, the boxes on
the IEP form stating that the Student's behavior does not
seriously interfere with instruction and can be addressed by the
special education teacher were checked, and a note was written
indicating that "classroom staff" would be responsible for
providing behavioral support. Pls.' Ex. E at 4.

The SRO found that there was "no basis" for the
Plaintiffs' contention that the DOE's failure to provide the
Student with an FBA and BIP was improper, as the record did not
indicate that "with refocusing and redirection, the [Student's]
stereotypical behaviors interfere in any way with the
performance of either the child herself or other children." SRO
Dec. at 17. The SRO further found that an FBA would have been
premature, as "an integral aspect of conducting an FBA is
determining how a child's behavior relates to the environment in
which it occurs," and the Student had not attended the
recommended placement. Id.

As the Court is required to defer to the SRO's
determinations regarding the substantive adequacy of the IEP,
the SRO's conclusion is supported by the record, and the
Plaintiffs have not offered any additional evidence regarding
the Student's behavioral record or the necessity of an FBA
beyond that which was before the SRO, the Court declines to find
that the failure to provide an FBA or BIP here constituted a
denial of a FAPE.

Moreover, in light of Court's independent review of
the record and the conclusions set forth above, the Court
concludes that the IHO and SRO's determination that the

placement offered by the DOE was reasonably calculated to enable the Student to receive educational benefits is entitled to deference.

Because the Court concludes that the DOE offered the Student a FAPE, it is not necessary for the Court to make findings regarding the appropriateness of Plaintiffs' unilateral placement or the equities surrounding the case. See Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005); W.S., 454 F. Supp. 2d at 150.

## The Student Is Not Entitled to Reimbursement for Pendency Placement

The IDEA's pendency, or "stay-put", provision reads:

[D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j). Pendency rights are recognized by both federal and state authority. See N.Y. Educ. Law § 4404(4); N.Y.C.C.R.R. tit. 8, § 200.5(m)(1).

Plaintiffs contend that the IDEA's pendency provision requires that the DOE provide the Student with the educational services she was receiving pursuant to her IFSP until the resolution of the proceedings regarding her IEP. According to the Defendant, pendency rights to continue receiving services provided pursuant to an IFSP do not apply upon a Student's initial admission to public school and, moreover, the relief now sought is greater than the services provided to the Student in EI.

The question of whether the IDEA entitles a child to pendency placement at the level of services provided under the child's IFSP during the resolution of a dispute arising in the transition from early intervention provided under "Part C" of the IDEA, which governs services provided to children from birth to age three, to preschool education services, which are provided under "Part B" of the statute, has been considered by the Court of Appeals in two circuits, the Third and Eleventh, but not in this circuit. For the reasons set forth below, the Court finds that the IDEA pendency provision does not apply to the Student in the instant case.

In Pardini v. Allegheny Intermediate Unit, 420 F.3d 181 (3d Cir. 2005), the Third Circuit held that a child

transitioning from IFSP services provided under Part C of the
IDEA to those provided according to an IEP under Part B was
entitled to continue receiving the IFSP services during the
pendency of due process proceedings regarding the adequacy of an
IEP. Stating that "'the [stay-put] provision represents
Congress' policy choice that all handicapped children,
regardless of whether their case is meritorious or not, are to
remain in their current educational placement until the dispute
with regard to their placement is ultimately resolved,'" id. at
190 (quoting Drinker v. Colonial Sch. Dist., 78 F.3d 859, 865
(3d Cir. 1996)), the Third Circuit concluded that the "operative
placement actually functioning at the time the dispute first
arises" constitutes the "then-current educational placement" for
the purposes of the pendency provision. Id. at 192 (citing
Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618 at 625-26 (6th
Cir. 1990)).

        In reaching that conclusion, the Pardini court relied
upon its reading of the IDEA's pendency provision "in context
with the rest of the IDEA statute." Id. at 191.    The court
noted that the stay-put provision dated to 1975, prior to the
addition of Part C to the IDEA in 1986, at which time "Congress
stressed that the transition from Part C to Part B upon a
child's third birthday was to be 'a smooth transition.'"    Id. at

186 (quoting 20 U.S.C. § 1412(a)(9)) (emphasis in original).
The court stated that "Congress has clearly recognized that the
needs of disabled children do not fit neatly into . . . age
defined stages," and added that an IDEA provision allowing for
either an IEP or IFSP to be employed if "consistent with State
policy" and "agreed to by the agency and the child's parents"
indicated that "the IDEA both anticipates and condones the
possible interchangeability of an IFSP and IEP during transition
to preschool." Id. at 191 (internal quotation marks and
citations omitted).


        The court noted that an interpretive letter issued by
the Office of Special Education Programs of the U.S. Department
of Education ("OSEP") stated that the agency did not interpret
the IDEA as requiring the provision of pendency services at the
early intervention level during the resolution of a dispute
about a child's placement under Part B.  However, the court,
having noted that "[t]he level of deference to be accorded to
such interpretive rules depends upon their persuasiveness," id.
at 192 (citing Michael C. ex rel. Stephen C. v. Radnor Twp. Sch.
Dist., 202 F.3d 642, 649 (3d Cir. 2000)), declined to defer to
the agency's interpretation, stating that "the OSEP never
explained how it reached that conclusion," and it was contrary

to the "plain meaning" of "current educational placement." Id.
(citation omitted).

Subsequent to Pardini, the Eleventh Circuit, in D.P.
ex rel. E.P. v. Sch. Bd., 483 F.3d 725, 729-730 (11th Cir.
2007), reached a contrary conclusion, stating, "We think
[Pardini] was incorrectly decided." Id. at 730. There, as
here, plaintiffs (three autistic children) had never been
admitted to a public school, but had been receiving EI services.
Id. at 727-730. Upon their "aging out" of the EI program on
their third birthday, the plaintiffs sought to continue
receiving EI services during the pendency of the due process
proceedings. Id. The Eleventh Circuit affirmed the district
court's determination that "the IDEA does not entitle the
[plaintiffs] to continue receiving services pursuant to their
IFSPs until such time as valid IEPs are put into place for
them." Id. at 730.

The Eleventh Circuit concluded that the holding in
Pardini was contrary to the "unambiguous language" of the stay-
put provision, which it read as providing for two "mutually
exclusive" alternatives: 1) "If the child is not applying for
initial admission [to public school], he shall remain in his
existing educational placement" during the pendency of due

process proceedings, or 2) "If the child is applying for initial admission, he shall be placed in the public school program" with the consent of the parents until the conclusion of the proceedings. Id. at 729. Accordingly, the court found that "[t]he district court properly held that the fact that the parents withheld consent to placement in the program offered by the public school (pursuant to the temporary IEPs) does not create another option" for them. Id. at 730.

Although it relied on the plain language of the statute, and therefore did not engage in an analysis of the reasonableness of the relevant agency regulations pursuant to Chevron U.S.A, Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984), the Eleventh Circuit noted that its interpretation of the pendency provision was consistent with the relevant federal implementing regulation in effect in 2004 when the due process complaint in the case was filed. D.P., 483 F.3d at 731. That regulation, 34 C.F.R. § 300.514(b), read: "If the [due process] complaint involves an application for initial admission to public school, the child, with the consent of the parents, must be placed in the public school until the completion of all the proceedings." The court further noted that the regulation was amended in 2006, after Pardini was decided, to specifically provide that "[i]f the complaint involves an application for initial services under this part

33

from a child who is transitioning from Part C of the Act to Part B and is no longer eligible for Part C services because the child has turned three, the public agency is not required to provide the Part C services that the child had been receiving." 34 C.F.R. § 300.518(c).

The Eleventh Circuit added that its interpretation was also consistent with guidance issued by OSEP. D.P., 483 F.3d at 730-31. Published with the implementing regulations, that agency guidance stated that while "[a] few commenters requested that the regulation be revised to make clear that the pendency provisions of §300.514 apply to children transitioning from early intervention services under Part C to preschool special education and related services under Part B," the agency's position was that the pendency provision does not, in fact, apply in such circumstances. Id. (citing 64 Fed. Reg. 12,406, 12,558 (Mar. 12, 1999)). The agency guidance published in 2006 in connection with the amended regulation states that § 300.518(c) was added "to clarify that if a complaint involves an application for initial services under Part B of the Act from a child who has turned three and is no longer eligible under Part C of the Act, the public agency is not required to continue providing the early intervention services on the child's IFSP." 71 Fed. Reg. 46,540, 46,709 (Aug. 14, 2006). In doing so, the

agency noted that services provided under Part C of the IDEA
were distinctly different from those provided under Part B of
the IDEA and that a child transitioning between Parts does not
have a "current educational placement" for the purposes of the
pendency provision. Id.

In the instant case, the Court will follow the
analysis of the Eleventh Circuit. Accordingly, the Court
concludes that as the Student is over three years old, is
transitioning from services provided under Part C of the IDEA to
those provided under Part B, and is, therefore, applying for
initial admission to public school, the IDEA does not require
that she continue to receive services at the level provided
during early intervention pursuant to her IFSP during the
pendency of due process proceedings. Therefore, the Plaintiffs
are not entitled to receive reimbursement for any such services
which they provided through a private placement during the 2005-
2006 school year.

The Court notes that while a child is generally not
eligible for Part C early intervention services beyond her third
birthday, 20 U.S.C. § 1432(5)(A), under New York law, because
the Student turned three after the first day of September, the
Student could have received EI services until "the second day of

January of the following calendar year." N.Y. Pub. Health Law §
2541(8)(a). However, after the CPSE found the Student eligible
for special education services, the Plaintiffs' unilaterally
discontinued the Student's EI services by enrolling her at the
McCarton Center.

## Conclusion

For the reasons set forth above, the motion of the
Plaintiffs for a reversal of the IHO and SRO decisions is denied
and the motion of the DOE for summary judgment is granted.

Submit judgment on notice.

It is so ordered.

New York, N.Y.
October 20 , 2008

ROBERT W. SWEET
U.S.D.J.